No. 23,516.

THE STATE OF KANSAS, *Appellee*, v. THEODORE OSSWEILER, *Appellant*.

SYLLABUS BY THE COURT.

1. CRIMINAL LAW—*Mental Disability of Defendant to Make Proper Defense—Duty of Court to Investigate.* Rule applied that, when it is brought to the attention of the court that a defendant, about to be proceeded against for crime, is incapable, because of mental disability, to make proper defense, the court should investigate the defendant's mental condition before going forward with the proceeding.

2. SAME—*No Formal Application for Investigation Necessary—Law Makes Application.* It is not material that the showing of present mental disability be in affidavits made in support of an application for continuance only, and it is not necessary that counsel, either for the state or for the defendant, make formal application for an investigation of the defendant's

sanity. In effect, the law makes the application for the defendant, and it is the court's duty to find out, by one of the statutory methods, whether he is in fit mental condition to be tried.

3. SAME—*Finding of Mental Defects of Defendant—Duty of Court.* Should the court find the defendant to be suffering from mental defect other than feeble-mindedness, he should be committed to the hospital for dangerous insane, under the provisions of section 4 of chapter 299 of the Laws of 1911. Should he be suffering from feeble-mindedness, he should be remanded to the probate court, under the provisions of section 2 of chapter 299 of the Laws of 1919.

4. SAME — *Mental Defects of Defendant — Evidence Sufficient to Challenge Attention of Court.* Affidavits of responsible persons, filed in support of an application for continuance, considered, and held to contain expressions of opinion and statements of fact sufficient to challenge the attention of the court to the subject of the defendant's inability to comprehend his position and to make his defense.

Appeal from Sedgwick district court, division No. 3; JESSE D. WALL, judge. Opinion filed June 10, 1922. Reversed.

*S. B. Amidon, S. A. Buckland, H. W. Hart,* and *Glenn Porter,* all of Wichita, for the appellant.

*Richard J. Hopkins,* attorney-general, *James A. Conly,* county attorney, *I. N. Williams,* and *S. L. Foulston,* deputy county attorneys, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The defendant, whose education had been for the priesthood, and who, from religious zeal, had taken the novitiate for the most austere monastic order, the Passionists, shot and killed Caroline Cunningham, the only girl he ever cared for, on the steps of St. Mary's Cathedral in Wichita, immediately after he had attended early mass on Sunday morning, August 1, 1920. He was convicted of murder in the second degree, and appeals.

As a child, the defendant lacked the play instinct, indispensable to normal development of the human mind. As a youth, he was slow in his studies, morose in disposition, did not participate in sports and games, and formed no youthful companionships. As a young man, he was morbid, subject to fits of depression, and unstable in purpose. He displayed great religious fervor, and studied to be a priest. He changed his mind, concluded he would become a lawyer, and went to law school for four weeks. Then for a year and a half he studied philosophy, preparatory to entering the priesthood. Within three months of the time he would have completed his course in philosophy, he decided he would become a monk, and

sought refuge with the Passionists, in order to save his immortal soul. He was affiliated with the Passionists for less than two years, and when he left their retreat he was a nervous wreck. On successive mornings he would go a mile to church in inclement weather, scantily clad, so that he might contract pneumonia and die. He was easily excited to rage, and his father testified that only from a sense of humiliation did he refrain from placing his son in an asylum. Later the young man seemed to improve, and was employed in a bank in Wichita. Officers of the bank testified he was entrusted with no work involving initiative or discretion, could not grasp instructions, was forgetful, and displayed the mentality of a boy of twelve or fourteen, although he was twenty-six years old. He enlisted in the army, and in August, 1918, was sent to France, where he remained until June, 1919. He did not enlist from patriotic motives; he hoped he might be killed. In France, he was orderly for a Roman Catholic priest who was chaplain of his regiment. In an affidavit for continuance, it was stated the priest, if present at the trial, would testify that the defendant, although very religious, was not merely queer and melancholy, but was mentally deranged. In the fall of 1919, the defendant was placed in his father's bank in the little town of Schulte, near Wichita. His conduct at Schulte was strange, and witnesses for the state who knew him there testified he was of unsound mind. Before going into the army, the defendant became engaged to marry Caroline Cunningham, but soon after he returned from France she broke the engagement. Sometimes, in fits of passion, he displayed a tendency to do personal violence, and on one occasion, for a fancied grievance, he threatened his father with an axe. In May, 1920, he purchased a pistol, which he carried about with him continuously. In May and June he told different persons he was worried and troubled, and said he intended to kill Miss Cunningham. He said he might just as well be lying in the penitentiary as to be in the bank at Schulte. The latter part of June he wrote Miss Cunningham a letter in which he said:

"My love has turned to hate, and I hate you and I curse you and hope all the bad luck possible will fall upon you if you ever marry any one."

On July 12 he wrote her the following letter:

"My dear Caroline: It's a year since you broke my heart, and I feel the disappointment as keenly as ever. Life has been a vale of tears and sorrows for me. I would have put an end to my life long ago, but for the thought of an afterlife. Dear Caroline, I have been mean to you, and wished you

every evil possible, but all the while I have loved you just the same. It was grief and sorrow that made me so cruel. But today I am writing you to ask your forgiveness. I take back the curse I pronounced on you, and the evils I wished you. Yes, Caroline, I'll try once more to forgive you, and ask your forgiveness. I hope and pray that God will bless you once more, and make you the happiest girl in this world. I ask you to pray that God may give me the grace to come back to ·the church and lead· a good life again. I intend to go to confession next Saturday. Henceforth .I'll try to bear my sorrows patiently and with resignation. You can marry Jimmie, if you like him, and I'll ask God's blessing upon your union. Oh how I would have liked to realize my fond hopes. There is but one thing I would like to ask you. It has been and still is a mystery to me, why you jilted me. Don't be afraid of hurting my feelings. My heart is broken already, and your telling me the truth will not make me unhappier. Let me hear from you soon. With love and good wishes, I am       Your heartbroken     Teddy."

On Friday before Sunday, August 1, the defendant told his sister his nerves were giving out, and he would be obliged to leave the bank.

After he fired the fatal shot, the defendant uttered a prayer, and leaned against a pillar of the cathedral, trembling violently. The pistol was in his coat pocket, and he had fired through his coat. He offered no resistance when the pistol was taken from him and, in answer to horrified inquiries, said he did not know why he shot the girl. He was taken into custody without protest, and in the afternoon was questioned by the chief of police and the county attorney. He said he arrived in Wichita about seven in the morning, and went to 8 o'clock mass. After the service he stood on the steps of the cathedral, simply looking about for any one he might know. He was not waiting for Miss Cunningham. When he saw her coming up the steps of the cathedral to the 9:15 service, he wanted to talk to her, but shot without speaking. A portion of his statement to the officers follows: .

"Q. What led up to this shooting? A. Why, there was various things led up to it.

"Q. Well, what were they? A. Well, I don't know—

"Q. . . . Don't you want to tell them? A. No, .they are more or less personal matters.

"Q. You don't want to tell them? A. I am willing to confess that I shot her, and of course the law can take its course that way. Of course it is all over—it is personal matters that have led me to it.

"Q. . . . Personal matters between you and her? A. Well, then other· things—different other things that—not only her, but different other things that came up in my life that—

"Q. Didn't you realize what you were doing this morning when you shot·

her? A. Well, I didn't intend to do it—I didn't know—because I was going to talk to her—and just all at once I took a notion and done it so fast, I didn't—I went up to her with the intention—I went up to her with the intention—walked up to her with the intention of talking to her, and I just—

"Q. Instead of talking to her, you shot her—is that the idea? A. Yes.

. . . . . . . . . . . . .

."Q. Well now, Theodore, you said something—that it was a personal matter between her and you—this trouble came up—you don't mean that there was anything wrong with her do you? A. No, not at all. . . . I thought she was an ideal girl all the time, but I didn't think very much of her breaking her promise without a reason, and I found out she gave it to me in bad faith. That is what grieved me so much, to think that for two long years she gave me her promise in bad faith.

"Q. Well, that really was what was back of the biggest part of this affair, this trouble, wasn't it? A. Well, I don't know—I had so many troubles. I don't know just what caused me to do it. It wasn't this matter alone, but I have worried all my life, but I don't know what it is—it's just foolishness sometimes—I don't know whether I inherited it or not. But I have never been satisfied anywhere—never been happy anywhere. And the responsibility of the bank made it so much worse, and I never had anybody at home or had anybody myself. I brooded alone about all my troubles, and I was always inclined to get in the blues quite often. Sometimes it would stick with me for a couple of days. If it hadn't been for her, I wouldn't probably have been here now; for I went into the army in the expectation of getting killed. I was glad to go over there just to get out of my troubles. Of course she cheered me up, and all that, but—I don't think I—if I didn't—if everything else had been all right, I am very sure I wouldn't have shot her, I guess—I thought too much of her to harm her in that way. .

"Q. Theodore, if you thought so much of her, what was the idea of shooting her? A. I don't know—I don't just know why I did it either."

At the trial, eminent alienists who had examined the defendant, and the only specialists in nervous and mental diseases who were called as witnesses, testified the defendant is a constitutional psychopath, which is the euphonious equivalent of Lombroso's "moral idiot." The alienists discovered in the defendant's mind a delusion that he might properly be the instrument of God to kill the girl for her sin in breaking her engagement.

The information was filed on September 30, 1920. On December 6, the defendant was arraigned, and stood mute. On December 9, a motion to quash the information was denied, and the case was set for trial on December 14. The defendant's father employed counsel to represent him. On December 14 and 15, the following affidavits were filed in the case:

"S. B. Amidon, of lawful age, being first duly sworn, upon oath deposes and says:

"That he is now and for more than thirty-three years last past has been

The State v. Ossweiler.

actually engaged in the practice of law in the city of Wichita, Kan., and for the thirty years last past he has been acquainted with the father of Theodore Ossweiler, and has been his attorney during such time; that he has known Theodore Ossweiler, Jr., practically all of the time since his birth; that he has been employed by Theodore Ossweiler to defend his son, the defendant in the above entitled cause, and that he has been intimately acquainted with the said defendant during the times herein mentioned.

"Affiant states that he is vice-president, and was vice-president during the times mentioned, of the Southwest State Bank of Wichita, Kan., and that both prior to the time the defendant engaged in the World War and after his return from France, said defendant worked for a time in said bank, and affiant states that he noticed at said time that the said defendant was queer, odd, morose, forgetful, and incapable of attending to business, and that in the judgment of this affiant during said time said defendant was a person of unsound mind; that this affiant saw the said defendant frequently, observed him carefully; that. he knew of the said defendant studying for a time for the priesthood, and following various other kinds of study, but that by reason of the condition of his mind, he was unable to accomplish in his studies that which he set out to accomplish.

"Affiant states that since the first day of August, 1920, he has had frequent audiences with the defendant, and has talked with him frequently, and affiant states that, in his opinion, said defendant is not at this time capable of making this affidavit, and is not mentally competent to make this affidavit, and that in the judgment of this affiant said defendant is insane and was insane on the first day of August, and is now insane, and at this time is feeble-minded and incompetent mentally to make a rational defense, and that the defendant is unable to give this affiant a rational account of the occurrences on the first day of August, 1920, and of how the occurrence happened and why it happened, and of the various facts leading up thereto and concluding therewith, and that in the judgment of this affiant said defendant does not understand the difference between right and wrong, and does not at this time understand the moral effect or turpitude of the crime which he is charged to have committed in this cause or the nature and consequence of said act. That if said defendant committed said crime, he did it while in a state of insanity, and while he was unable to understand the difference between right and wrong; that affiant makes this affidavit for and on behalf of the defendant, and that in the opinion of this affiant and in the judgment of this affiant, said defendant is incompetent to make this affidavit or to make any defense in said cause, by reason of the fact that said defendant is feeble-minded and insane and does not understand what is being done in this cause, and does not understand the difference between right and wrong, and does not know the nature and effect of the trial now about to be proceeded with. Affiant states that he has had full charge of the defense in this case, and that he has consulted with the father of the defendant very frequently in order to secure the presence of witnesses for the defense, and affiant states that said defendant cannot safely proceed to the trial of this cause at this time on account of the absence of material witnesses to the said defendant. [The remainder of this affidavit was

in due form as an affidavit for a continuance on account of the absence of material witnesses.]"

"Theodore Ossweiler, of lawful age, being first duly sworn, upon oath deposes and says:

"That he is a resident of Sedgwick county, Kansas, and has been a resident of said county and state for 42 years; that he is the father of the defendant in this the above entitled cause, and affiant states that the defendant is now and has been, in the judgment of this affiant, and was on the first day of August, 1920, and ever since has been and is now, insane and unable to make a rational defense in this the above entitled cause, is feeble-minded and mentally incompetent to make a rational defense; and that he is now and has been since the said first day of August, and was on said first day of August, 1920, insane; that he employed the firm of Dale, Amidon, Buckland & Hart to defend the defendant in the above entitled cause; that he has given them such information as is within his knowledge, and affiant further states that in his judgment defendant does not possess the necessary knowledge to determine the nature of the proceedings now being had in this the above entitled cause, and his mental condition is such that he cannot understand and does not understand the nature of the proceedings now taking place in this cause, and the nature of the proceedings in this cause, and that he is not mentally capable of making his defense in this cause, and for that reason his attorneys have been unable to properly prepare a defense in this cause, and are unable to go to trial at this time; that said defendant is now unable to recall the facts of the transactions involved in the charges against him so as to assist his counsel in the preparation of his defense or to testify as a witness or even to remember events from day to day."

Following filing of these affidavits, a colloquy ensued between the court and counsel for the state concerning what should be done. The court and counsel for the state sought to have counsel representing the defendant admit he was applying for an inquiry respecting the defendant's present sanity, or else admit he was applying for a continuance only. He stood on the affidavits. The record shows the following:

"By the court: Do you care to say anything further on the matter?

"Defendant's counsel: No, your honor.

"By the court: You asked for a few moments for conference; are you ready to proceed?

"Defendant's counsel: We are ready.

"By the court: Has the state anything further to state?

"Plaintiff's counsel: Nothing.

"Defendant's counsel: Except, if the state's attorney wants the court to make a finding—judgment, that the defendant is insane, and send him to the asylum for the insane, we have no objection to it.

"Plaintiff's counsel: But we are not asking for that.

"Defendant's counsel: Then we re-offer our affidavits.

"By the court: What has the state to say?

"Plaintiff's counsel: We have nothing further to say.

"Defendant's counsel: Our affidavits are considered as filed and admitted, are they?

"Plaintiff's counsel: We understood as an application for continuance. I believe that was counsel's statement.

"Defendant's counsel: Under the statement of Mr. Elcock, assistant county attorney, as to what he thought the court's duty was—to make a finding, we will re-offer the affidavits for that purpose, on the question of the defendant's present sanity or insanity."

Another colloquy ensued, in which counsel representing the defendant refused to be placed in the attitude of making application for an investigation of the defendant's present sanity. The colloquy was brought to a conclusion as follows:

"By the court: I imagine, under this statute, the application is made for the purpose of continuance, on the ground that the defendant is insane at this time and unable to proceed to trial for that reason, that the court has the power to appoint a commission to examine into his sanity, or to empanel the jury to try the issue.

"Plaintiff's counsel: Or try it yourself as a court.

"By the court: I rather imagine the method of procedure is largely to the discretion of the county attorney as to whether it shall be a commission or whether the jury shall determine the matter.

"Plaintiff's counsel: A commission is satisfactory to me.

"Defendant's counsel: If the commission is appointed, I want [the record] to show that the commission is appointed on the application of the state. We are not applying for the commission.

"Plaintiff's counsel: As I understood, here is an affidavit that purports to show that this defendant is now insane. He is in that condition where he is unable to properly prepare for a defense or make a defense. That is a showing before the court on the part of the defendant. If the court determines to try this at this time, why, it is immaterial to the state which way it is tried. I merely suggest the commission as probably a briefer way to get at it, and a quicker way. I am not asking, particularly, for a commission, or court, or jury.

"Defendant's counsel: Let the record show that we are ready to go ahead with the trial of the case.

"Plaintiff's counsel: We are ready.

"Defendant's counsel: Let the record show that in announcing ourselves ready for trial, we do so, not waiving any of our rights in our affidavit for continuance.

"By the court: The applications for continuance are overruled."

In the case of *In re Wright*, 74 Kan. 409, 89 Pac. 678, the third paragraph of the syllabus reads as follows:

"Where upon the trial of a person charged with a crime it is claimed that he is then unable to make answer and defense thereto in a rational manner, because of mental incapacity which has arisen since the alleged commission of

the offense, it is the duty of the court where such trial is pending to make inquiry concerning such disability, and, if found to exist, to stop further proceedings in the trial until such disability has been removed. Failure in this respect, whereby an insane person is forced into trial, will render all subsequent proceedings void."

In the Wright case the petitioner was charged with felony, arrested, and brought before the judge of the city court of Wichita for preliminary examination. The examination was postponed until April 4. On April 3 the petitioner was adjudged insane, as the result of proceedings in the probate court. On April 4, a motion called a plea in bar was filed in the city court, to discharge the petitioner, on the ground the city court had lost jurisdiction. The proceedings in the probate court, including the verdict of lunacy, were set out in the motion. The court denied the motion, held a preliminary examination, bound the accused over to the district court and, in default of bail, committed him to jail. In holding the city court did not lose jurisdiction, the court said:

"It is the law of this country, independent of any statute, that a defendant shall not be compelled to answer to, or defend against, a criminal charge if mentally or physically unable at the time to do so in a rational manner, when such disability has developed after the alleged commission of such crime; but, in the absence of a statute to the contrary, the duty of determining whether or not such disability exists rests with the court whose duty it is to hear such answer or defense.

"When the attention of a court is called to the fact that the defendant about to be arraigned before it is unable, because of mental disability, to make proper defense to the accusation against him, it is doubtless the duty of the court to take notice of the suggestion and to make such inquiry concerning it as will fully protect the rights of the accused. Upon such an inquiry the findings of a court in lunacy proceeding, and any other proper evidence, may be received and considered. The verdict and proceedings presented to the magistrate in this case can only be considered as evidence tending to show the present mental condition of the petitioner. It appears that this evidence was offered for another and different purpose, but the object and manner of its presentation are immaterial. It was sufficient to call the attention of the court to the claim that the defendant was insane and incapable of making proper answer to the charge pending against him. This was a matter of too much gravity to be ignored because of any supposed irregularity in the form of its presentation. It was the duty of the magistrate to take notice of this claim and determine the defendant's mental condition before proceeding further with the examination." (p. 411.)

Although authorities were not reviewed in this opinion, they were carefully examined before it was written, and the decision estab-

·lished the practice to be followed in this state. Since the decision was rendered, it has been supplemented by two statutes.

Section 4 of chapter 299 of the Laws of 1911 reads as follows:

"Whenever any person under indictment or information, and before or during the trial thereon, and before verdict is rendered, shall be found by the court in which such indictment or information is filed, or by a commission or another jury empaneled for the purpose of trying such question, to be insane, an idiot or an imbecile and unable to comprehend his position, and to make his defense, the court shall forthwith commit him to the state asylum for the dangerous insane for safe keeping and treatment; and such person shall be received and cared for at the said institution until he shall recover, when he shall be returned to the court from which he was received to be placed on trial upon said indictment or information." (Gen. Stat. 1915, § 10043.)

Section 2 of chapter 299 of the Laws of 1919 reads as follows:

"That whenever in a court of record, during the hearing of any person charged with a misdemeanor or crime, it shall be made to appear to the court that the person is feeble-minded, the court shall summarily remand such person to the probate court of the county for examination under the provisions of this act."

The statute of 1919 took feeble-mindedness out of the statute of 1915. Should the court find the defendant to be suffering from mental defect other than feeble-mindedness, he should be committed to the hospital for dangerous insane; should he be suffering from feeble-mindedness, he should be remanded to the probate court.

There can be no doubt about the sufficiency of the affidavits filed on December 14 and 15 to challenge the attention of the court and move it to investigate the defendant's mental condition. The statements contained in the affidavits were made under the oaths of responsible persons; one of them subject to discipline by the court, and both of them subject to the penalties for perjury. The affidavits contained, not merely expressions of opinion, but statements of fact which placed the defendant within the protection of the court. As indicated in the Wright case, it made no difference that the showing of present insanity was made in affidavits supporting an application for continuance only. When the showing was presented, it was the court's duty to find out if the defendant was in fit mental condition to be tried, whether counsel for either side made application for the inquiry or not. In effect, the law made the application for the defendant and, however the attorneys might fence about the matter, the court was not authorized to proceed with a trial on the merits until it had ascertained, by one of the statutory methods, whether

the defendant was capable of making a rational defense. Trial on the merits is, of course, no substitute for the preliminary investigation. The question of capacity to commit crime on August 1 bears no relation to the question of capacity on December 15 following to defend against a charge of crime.

The judgment of the district court is reversed, and the cause is remanded for further proceedings.